Good morning, Your Honors. My name is Robert Patrick Sticht. I am here today to represent Anne Peterson, who is the Executrix of the Estate of Lucille Abbott Sexton. This case is here on appeal from the United States Tax Court, and the briefs and record excerpts appear to be in order, including what is the latest submission that I have received yesterday, was the letter brief of the Respondent, so I am aware of that, should that come up, Your Honors. Before arguing for a reversal of the Tax Court's decision, I wish to reserve about five minutes of my time for rebuttal, if I may. Well, Your Honors, I do believe that the briefs are straightforward, relatively, on the case. I was the trial attorney as well in the evidentiary hearing, and I believe that we did capsulize both with government counsel what the pertinent evidence was that was in the case, with one exception. The one exception was that the government never provided to us the actual report that Mr. Harkevy had prepared, which would have been a little more interesting to me. I don't think it's dispositive, necessarily, but interesting in the sense that that report might have gleaned further facts in our favor concerning how much lawyering he was really doing versus testifying expert as the government's position is. So what I would like to do, if I may, this morning, is, in addition to answering the bench's questions on this, is focus us on really what seems to be the battleground. The battleground appears to be the government arguing I have a valid agreement, and you have to have a standard of conduct which is very high to separate me from that valid agreement, that settlement agreement. And the estate is saying, well, you're ignoring all along what is the central point of the motion to vacate, which was Mr. Harkevy was burdened with a conflict of interest. Now, this battleground about a valid agreement, perhaps on its face, on the four square corners of the document, without looking to the context, and you look into the context, you say, well, maybe he's tainted. Maybe this agreement is tainted by the same taint by which his representation was tainted. And then you consider that this is not just a private litigant against a private litigant or a former client being private parties. This is the United States government. This is the IRS. This is an agency of the government. And this is the subject of taxes, one of the most sensitive subjects to a client. Well, it wasn't clear to me how in any way the, what you allege is a conflict of interest affected his performance for the estate. And do you want to, what actual impact did it have on his representation of the estate? I have the same question. I think it's a good question, but I think it's a little bit misleading. It was raised also by the tax court in the opinion. It's a good question because we normally want to go to a causal relationship between a conflict of interest and something that occurred. We may have been misunderstood, actually, in our argument because we pointed to a number of factors that we call were inadequate representation, not because we felt that Mr. Harkavy needed to be sued for malpractice. That's not the solution here. The solution is to put the duty of disclosure on the IRS where they keep these arrangements in secret. And by the way, testifying experts, if they are going to be part of the process, which I fully encourage, then a duty of disclosure of those facts so that the client can consider it. Well, would you try to respond to the question that was? If you look at the conflict at the time of the audits, not at the time of the litigation, the court tried to separate, the tax court tried to separate between the time he performed the services and the time of the settlement agreement. If you look right at the time of the audits, he was facing an enormous burden, as we pointed out in our brief. He had a state which had a $68,000 reported liability, rising to over $400,000. He had to deal with the issues. And then you look at his performance on those issues at the same time that he's performing for the IRS. And then you look at how much he was paid. He was paid more by the IRS than he was paid by his private client. All in this relatively short period of time. Is there any suggestion that what he was paid effectively did? Yes, Your Honor. Oh. What, what, how did you show that? The suggestion, as you've asked, is that he had a financial interest. He had a personal financial interest. I did. A financial interest. The financial interest also affected whether or not he would be You think that the IRS, that the IRS paid him, had an effect on his performance? How did you show that? I mean, let's assume, which I think is contrary to fact, but let's assume it was a conflict. How did it actually play out? Well, I'm like What did he do that he shouldn't have done? Unlike in Judge Hawkins' opinion in the Dixon case, where the fees for the attorney were directly paid to the attorney as part of the settlement process itself, which corrupted the process and the integrity of the court in the process of the stipulation process of the tax cases. We don't have that direct payment of fees by the IRS. No, you don't. So what do you have? Corrupt. But what you have is what was stated as clearly in the Supreme Court of California's case of Flatt. They said, once the client engages a lawyer, that client is entitled to that lawyer's undivided loyalty until that matter is concluded one way or another. And what you had here was a representation that was pure, sanctified by the attorney-client relationship between Mr. Harkavy and Ms. Peterson. Let me see if I can take a stab at focusing this. It seems to me that one argument might be that there was a conflict of such a nature that we ought to presume prejudice and not inquire further and simply send it back. Let's put that aside without saying whether that argument has merit or doesn't have merit or should be sustained or not. The other argument is that there was a relationship with an opposing party, which should have been arguably disclosed, either by the government or by the lawyer to his client, and that that affected his behavior in representing the estate. In this second area of inquiry, if you will, we must necessarily examine what, if any, impact that had on his performance. It's a little like the confession that adherents of some faith give, we have done those things we should not have done and failed to do those things that he did not do that he should have done, and those things that he did that he shouldn't have done, and how that ultimately impacted the representation.  Thank you, Your Honor. Let me try. First of all, his duty to communicate to his client he did not do. As soon as he was engaged by the IRS or had the opportunity to do that I give you that. Go on. Okay. Duty to communicate that to the client. Once he was silenced by that contract and by federal law 6103, he was in the position, as the American Airlines case said, was in the position at that point where he was deciding what was confidential, would or would not be released to the IRS about the estate. He made those decisions. He was not entitled to do that. I'm still waiting for the answer to my question. Once he was engaged by the IRS, he was also served with notices of deficiency in the case. His response to the notices of deficiency was a year after he had performed these services. And in the meantime, he did nothing on the case. He put his entire energies at the very beginning of his representation into his contract and, as conceded by the government, concluded that in rendering his report within two months. This is the same attorney at consequences down the line. The first element of prejudice that you're attempting to identify is that his duties with the IRS took up so much of his time, he didn't have time to devote sufficiently to this case. Is that what you're saying? Well, he did not devote time. Is that what you're arguing? Yes. Did you go through all he was doing and show he was, I mean, he must have had more than one client? No, Your Honor. What we did was look at the record of the estate tax case and the gift tax case, and we looked at that from the perspective. Oh, but you didn't make any showing as to what his actual work schedule was, did you? No, Your Honor. So when you say he devoted all his time, you just don't know. No, what I'm saying is that he devote, between the two engagements, which are the two relevant engagements here, I'm not talking about other clients. Between his two engagements, it was clear that he performed for the IRS within two months when he did not perform certain acts. So did that somehow affect the estate? Yes, he did not perform certain acts for the estate. How did it affect the estate? Well, first of all, he filed a petition that was defective. The petition was defective. It was beyond the 90 days that he attempted to amend it. In most tax court cases, he would have been served with by the government, you're beyond the 90 days, you can't amend it, and he would have lost the gift tax case. It was only a fortuitous event he was allowed to amend it. So how was that prejudicial? Well, we're focused — I'm trying to answer Your Honor's question about — But we are trying to show what harm was done. And you haven't shown any so far. The harm that's done is to the integrity of the judicial process here. We have an integrity of the relationship — Your Honor, you're over in Box 1. I see, Your Honor. You're over in the box that says it was such a conflict that we shouldn't even examine any element of prejudice. We should simply assume that there was and send it back. Regardless of the merits of that argument, I want you to focus — we would like you to focus on Box 2, if you will, which is assume that the relationship with the IRS is of such a nature that you must show prejudice to the estate in order to prevail. That's what we want you to focus on. Thank you, Your Honor. Well, once again, we think that we put forth the argument that the representation that was required of a tax attorney in this matter fell short of that standard. And it's a very high standard while he's burdened with this contract with the IRS, which he can't talk. Let me ask you this question. Did you put on an expert witness in the proceedings that testified, you know, I'm an estate tax lawyer and a gift tax lawyer, and I've examined what this lawyer did in this case, and it fell below the standard of care in the following respects, 1, 2, 3, 4? You didn't do that. No, Your Honor. So you don't have any — I mean, I think you just go right back to Box 1 whenever we try to get you into Box 2. Not exactly, because we cited the Wilson case as a leading case because we thought that Wilson outlined the parameters of this. And it said if he's laden with a conflict of interest and there's an inadequate representation, there's something there. Now, in the Wilson — It's a Wednesday offense, and there's no way of curing it. What the judge in the tax court said was, well, look, I've listened to Mrs. Peterson's testimony, I've listened to Dennis Harcovy and Jack Klinghoffer, and all these testimonies, I don't see how an attorney would have done anything differently here, and so I don't see how the estate's been harmed. And I think that that's an improper focus because what that's doing is saying, let's look at the testimony of these parties to see if anything would have been done differently, according to the judge, when, instead, we know from the record of the estate and gift tax cases that the estate was damaged. It was not allowed to put on an expert witness of its own in the trial at the time of the settlement because Mr. Harcovy did not prepare the report and get it to the court on the time required by the local tax court rules. Well, let's shift to one, for example. You tried that under the rules of professional conduct. What violation was there of that? I'm sorry, Your Honor. You tried the case under the rules, the ABA's rules for professional conduct. How were those rules violated? Rule 1.7. Yeah, I know the rule. What was the violation? The violation is that there's a direct relationship between the IRS's adversary in the estate case and Mrs. Peterson. That adversarial relationship — But it's a different case. It's an unrelated matter. Totally unrelated. Yes. It doesn't seem to me to fall under Rule 1.7. Well, Rule 1.7 has not been interpreted that way, Your Honor. You know, I taught the subject for 20 years at Bolt. I never heard of anybody making the contention you're making. I've never seen a case where the IRS hired an expert. No, but I'm asking, do you have any reason to suppose your interpretation is right? Absolutely, Your Honor. What? And the reason is stated in the rule itself. The advisory committee's opinion on Rule 1.7, which was used by the tax court and by the IRS, addresses a situation that is different here, where that confidential relationship between the client and the lawyer is established first. There's no way that he could have been led to violate a relationship with the estate in doing some work in a totally unrelated matter. Well, I don't agree with that. He had an option in his contract, for example, that he would be a testifying expert, so-called, under the option. He needed Mr. Klinghoffer, his adversarial opponent for the IRS chief counsel's office. He needed his recommendation to Mr. Stanek down the hall to hire Mr. Harkavy as the expert because he was doing a good job. His personal interest in the matter, his financial interest in the matter, his conduct with respect to handling of the estate, by the record itself, without expert opinion, shows that what he was doing was spending his time first on the IRS contract, finishing that, and then directly and affirmatively misleading his client by telling them in this convoluted July meeting, I'm working on the IRS on taxing the Internet.  No, Your Honor. Do they intend to? That is something we can take care of after this oral argument. I'm not suggesting or encouraging. I simply wanted to know the facts. You have about five minutes left. Did you want to save it for recess? Yes, I did, Your Honor. I'd like to ask you, if you said one thing that Harkavy did not do, and that was, pardon me, get a petition filed because he was late and he couldn't file a petition. Ordinarily, he was late in the amendment, yes, but that was overlooked. And he was permitted to do that? Permitted to amend. Okay, well, then I guess I've not heard you say there was anything he did not do in representing the estate that he should have done. He did not get a protest early on, a protest to the original letter. He should have got an appeals conference immediately. He did not get that, and the IRS exclaimed the reason he didn't get that was because of his poor performance, and that's outlined in our brief. He was also sanctioned by the tax court judge Foley at the time that if he did not provide discovery responses, both written interrogatories and documents, then he would lose his ability to even argue the loan argument at trial. And he did provide that? It was never clear in the record whether the government was satisfied with his responses, and then he did not get an expert. He had an expert hired. The estate paid for that expert. It was included as part of the $16,000 fees the government tried to put as administrative fees. That expert was denied by the tax court so that by the time he got to the conference call with the judge, at which it was disclosed he had an uphill battle to climb, he didn't have an expert. His discovery was not in order, and he had a case pending for two years when it might have been settled at the protest level based upon the arguments we've set forth. If you thought his performance was deficient, why didn't you have some testimony on that? Because, Your Honor, it was deliberate. I will tell you that it was deliberate that in this case what the estate was seeking to do was obtain the information concerning what was the nature of this relationship because it had not been disclosed to the estate. It was not intended to go and sue the attorney for malpractice. Thank you, Your Honor. Thank you. We'll hear from the Commissioner at this time. Good morning. May it please the Court. I'm Francesca Tamami, Counsel for the Commissioner of Internal Revenue. I'd like to immediately address a couple of the points made by the estate in its opening argument. First of all, I think this Court has its thumb directly on the issue, which is that there's simply no evidence of prejudice to the estate as a result of Harkavy's expert witness services for the IRS. As far as the allegation that Harkavy sort of sitting around working on his contract and ignoring the estate's case, that's simply not supported by the record. First of all, his failure to get the protest in was before the IRS was even seeking an expert partner's case, so any sort of errors on Harkavy's part at that period had absolutely nothing to do with his engagement with the IRS. There was no engagement to speak of at that point. The notices of deficiency were issued around the time that he was hired as an expert to be an expert, to provide expert services, and he timely filed petitions in the estate's case within 90 days of the date the notices of deficiency were issued. He was allowed to amend one of the petitions. The IRS had no objection to it. During 1999, he spent the entire year negotiating with the appeals office trying to obtain a settlement in the estate's case. This is reflected in the record in the appeals case activity record of the appeals officer. Was the service under any obligation to disclose its relationship with the estate counsel to the tax court? I think the IRS was not under a duty to disclose. Just to sort of set the record straight, first, the IRS is obligated under Section 6103 of the Internal Revenue Code to keep taxpayer information confidential, so the suggestion that the IRS has not wanted to turn over the expert report and has not wanted to comply with the estate's request in this case is not, it's because of a duty, a statutory duty imposed on the IRS. I'm trying to imagine a case, the best thing that comes to mind is a criminal case in which the counsel for the defendant has been hired in an unrelated case to offer expert testimony in another criminal case, totally unrelated. Whether the prosecutor would be under an obligation to divulge that to the court. What do you think? I'm really not sure because of, I'm not really familiar with criminal procedure. Let's say it's a civil case. Okay. In a civil case, I think one thing that would not be at issue in that case because it does not involve the IRS, it does not involve Section 6103, then the prosecutor or the attorney for the government might be at liberty to speak about the facts of the other matter. In this case, the IRS was barred by federal law from disclosing taxpayer information to third parties. From disclosing even the fact of its relationship with Harkavy? I think the fact of its relationship with Harkavy could have been disclosed, but I think really the duty was on Harkavy to point out that, well, at the same time as I'm working for you, IRS, I am also representing an estate against you. This is a potential conflict. Maybe it should be evaluated. In fact, the appraisal coordinator who hired Harkavy for the McGuire Partners case testified that if Harkavy had mentioned the fact that there was a potential conflict of interest, the IRS would have evaluated it. In hindsight, it probably would have been a good idea for the IRS, even though I don't think it had a duty to do so, to search its computer records. Presumably it has some kind of central computer system where it could have determined that he had a power of attorney on file for the estate, asked Harkavy whether he thought that presented a conflict of interest, and asked him to obtain the executor's written consent. It wasn't papered in that way, but I want to emphasize that there's no evidence that there was any sort of attempt to obtain an inappropriate benefit. There were clean hearts. I'm not suggesting that. The implication of my question, so it's clear, is this. If the service had disclosed it to the tax court, it necessarily would have been disclosed to the client. And I assume at that point that the court would have engaged in some sort of inquiry with the client to find out whether this is known and studied and waived or not waived. And if it were not waived, a new counsel obtained, or the problem could have been avoided. I would agree with you, and I think in hindsight that probably would have been the correct course of action to take in terms of making sure that the model rules that govern attorney conduct are met, that all the proceedings seem fair. But for purposes of this case, when we're talking about a stipulated decision that was entered pursuant to a settlement agreement, the standard is that the estate must show that it was prejudiced in some way. And in this case, there's simply no evidence of prejudice. The IRS did not accept the settlement offer from Mr. Harkavy based on any offer of divulging confidential information. Harkavy did not offer to settle with the IRS based on any promise of future employment. So that my point's clear, whether it had an enforceable duty or obligation to do so, had the government disclosed this, the client would have had the opportunity to make an informed choice and proceed from there. And even if it wasn't a conflict, the client may have been able to say, no, I won't waive that. I didn't know it, and I'm terribly disappointed that my client, my lawyer, my own lawyer didn't tell me that at the same time he was representing me, he was working for pay for the Internal Revenue Service. And I want different counsel and a continuance. So I have counsel completely unfettered by any feelings of dual loyalties of any kind, whether they're direct violations of the rule or not. Do you understand? Does that make sense to you? It does make sense to me, and I agree. I think, you know, I agree with your point that that would have been a better course of conduct if at the time the parties, if, I think if the fact of a conflict of interest honestly had dawned on the parties, that may have occurred. In this case, the two. It certainly should have dawned on Harkavy in the sense of disclosing it to his client. Correct. I think we can all agree about that. Correct. I think in this case, to the extent that, it's not really clear to what extent the IRS personnel involved in the Estates case were aware that he was working as an expert for the IRS at the same time. To the extent that they were aware of this relationship, I think the two matters were so unrelated that it really didn't dawn on anyone in the IRS that there was some kind of conflict of interest that needed to be evaluated. But regardless of what would have been a more proper course of conduct in this case, at the end of the day, there's simply no evidence of prejudice against the Estate. There's no evidence that the settlement was obtained by undue influence, by fraud on the court, or that the Estate was not properly represented. The deficiencies that had been asserted against the Estate were more than $500,000. The settlement that Harkavy obtained reduced it to $228,960. It was a 45% reduction. The trial judge had expressed an unfavorable view of the case. The executor contacted her own accountants who refused to support her position, and one of them was planning to, in fact, testify for the commissioner at trial. So the settlement was clearly reasonable and fair, and there's simply no evidence that Harkavy's relationship with the IRS tainted his representation of the Estate, tainted the settlement, or tainted the IRS personnel involved in the Estates case. Let me see if I understand. One of the things that you just told us, one of the accountants that the Estate consulted was planning on testifying against the Estate's position? That's correct. How did that come about? The transcript from the evidentiary hearing shows, I think it was during Mrs. Peterson's testimony, she was relating the events of, I think it was October 3, 2000, the day that the ultimate settlement agreement was reached. Harkavy had called her to let her know that we had this conference call with the judge. He expressed an unfavorable view of the case. I think we should try to reinstate the settlement offer that the appeals office had previously made. So she was upset about this and said, well, fine, go ahead and talk to them. And then she decided independently to consult her accountants. I think one of them was the accountant that had prepared the Estate's tax returns, and one was her personal accountant for her partnership and the affairs of her spouse. And I don't recall, I think it was the accountant for the Estate was the one, she testified that he seemed very scared and he said he was going to be called for the commissioner as a witness at trial. She said at the same portion of the hearing that she had actually learned this information from Harkavy a week earlier and didn't understand why her own accountant would be testifying against her. She then called her personal accountant to try to garner his support for her position to get him to agree with her that these transfers we made, they were loans, they were not gifts. And he said, I was never aware of any loan. This was her testimony at the evidentiary hearing. So I think all of these facts together show that the settlement was fair, it was reasonable, it was entered into with the executor's full knowledge of the circumstances, and there was simply no prejudice to the Estate whatsoever as a result of Harkavy's employment with the IRS. Thank you. We understand your position. Thank you for your argument. Thanks for coming in today. Rebuttal. Thank you, Judge. The, just a minor modification in the event this becomes a record, Mrs. Peterson's testimony, there were two accountants. I believe what the testimony accurately reflects overall is that she called these two accountants because of what she was told about this conference with Judge Foley. First accountant was running scared. He was on the IRS's witness list, but the IRS never planned to really, to call him apparently. The second accountant, who denied any knowledge of anything, was not supportive. Now, I think that's a far cry from one was going to testify against the Estate and had been lined up to do so. So I just want to correct that. Now, was the IRS under an obligation to disclose? The answer to this was, well, this is barred by 6103, but 6103 has embodied in it exceptions for a court to go ahead and have the waivers of the kind that would be necessary here to investigate. And that the duty on Dennis Harkavy to tell the IRS, in fact, he did disclose in his resume that he was representing practitioners in the tax practice. The IRS had a power of attorney on file. A simple run of the CAF, the CAF system, in these types of cases would clear up the matter in all future cases. And I don't know of any prior case other than this one to come before. The idea that this was a fair and reasonable settlement with a 45 percent reduction, the accountant planning to testify for the government in full awareness of the facts. I think it's demonstrated by the record that there's not full awareness, and I don't think there is a 45 percent reduction when we look at the actual math. If there's no further questions, I will conclude by asking for a reversal. Thank you. Thank you. Thank both counsel for the argument. The argument here today, the case just argued, will be submitted for decision and the court.
judges: Noonan, Thompson, Hawkins